Eric MILLER and Robert Lucia, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

The NEW AMERICA HIGH INCOME FUND, Ostrander Capital Management Corp., Patricia Ostrander, Richard E. Floor, Bernard J. Korman, Joseph L. Bower, Franco Modigliani, Ernst E. Monrad, Ellen Terry, Bateman Eichler, Hill Richards, Inc., Butcher Corporation, and Michael R. Milken, Defendants.

Pete and Pat BOMIRETO, Jt, John Silak, Mary Bruce, and C.H. Rhumann, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

The NEW AMERICA HIGH INCOME FUND, Ostrander Capital Management Corp., Patricia Ostrander, Richard E. Floor, Bernard J. Korman, Joseph L. Bower, Franco Modigliani, Ernst E. Monrad, Ellen Terry, Bateman Eichler, Hill Richards, Inc., Butcher Corporation, and Michael R. Milken, Defendants.

Civ. A. Nos. 90–10782–MA, 90–10845–MA.

United States District Court, D. Massachusetts.

Jan. 9, 1991.

Nancy Gertner, Dwyer, Collora & Gertner, Boston, Mass., for plaintiffs Eric Miller et al.

Nancy Gertner, Silverglate, Gertner, Fine & Good, Boston, Mass., for plaintiffs Robert Lucia et al.

Patricia A. Early, Choate, Hall & Stewart, Boston, Mass., for The New America High Income Fund and Ostrander Capital Management Corp.

Peter M. Saparoff, Helen Ann Robichaud, Gaston & Snow, Boston, Mass., for Bernard J. Korman, Joseph L. Bower, Franco Modigliani, and Ernst E. Monrad.

J. Dennis Faucher, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for Bateman Eichler, Hill Richards, Inc. and Butcher & Singer, Inc.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

Plaintiffs, representatives of a putative class (the "Plaintiff Class") of all purchasers of the common stock of New America High Income Fund ("New America" or "the Fund") between the dates February 19, 1988, and October 13, 1989, and representatives a putative subclass (the "IPO Subclass") of all purchasers of common stock pursuant to the Fund's initial public

offering ("IPO") (prospectus dated February 19, 1988), brought this suit[1] against defendants New America and its investment advisor, Ostrander Capital Management Corporation; individually against the Fund's directors (two of whom are also officers of Ostrander Capital); against Bateman Eichler, Hill Richards Incorporated and Butcher Corporation, in their capacity as lead underwriters and also as representatives of a putative defendant class of all underwriters who participated in the IPO; and individually against Michael Milken,[2] alleging violations of federal securities statutes and regulations, common-law fraud and negligent misrepresentation, and civil RICO. The action is before the court on defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b). For the reasons stated below, the motion to dismiss is allowed with respect to all claims except those stated under §§ 11 and 12(2) of the Securities Act.

## I. BACKGROUND

### A. Allegations in the Amended Complaint

New America, a Maryland corporation with a principal place of business in Massachusetts, was organized in early 1988 with the express purpose of investing in the then booming business in "high yield" fixed-income securities, better known as "junk bonds." The Fund's highly leveraged capital structure was comprised of $105 million of senior extendible notes (the "Notes"), 790 shares of preferred stock with a liquidation preference of $100,000 each (the "Preferred Shares"), and common stock. The common stock was first offered in conjunction with a registration statement and prospectus dated February 19, 1988; the initial public offering consisted of 23 million shares at $10 each. At all times since the initial offering, the common stock has been publicly traded on the New York Stock Exchange.

Beginning in April, 1989, revelations about the default rates of high-yield securities began to shake the foundations of the junk bond market. The most important of these, according to the complaint, was a report in the *Wall Street Journal* of April 14, 1989, on an unpublished study, compiled by Professor Paul Asquith of the Massachusetts Institute of Technology and others, which found that the true rate of default of junk bonds was much higher than the investment community then believed. At first, New America downplayed the significance of these revelations, but on October 6, 1989, it "slashed" the monthly dividend on the common stock (from 11.5 to 10 cents), Amended Complaint ¶ 81, exposing its own crumbling foundations. The stock, which had once sold for as high as $11, fell to $5.375 per share. *Id.* ¶ 82. Plaintiffs chose October 13, 1989, as the end of the class period, presumably because enough information was available at that time to put them on notice of the true state of New America's affairs.

Plaintiffs allege that New America, its investment advisor, the directors, the underwriters, and Milken are all liable for the role they played in these events. According to the amended complaint, these defendants all conspired with Drexel Burnham Lambert, Inc. ("Drexel" or "DBL"), to create and use New America "as a purchaser of last resort for that portion of DBL's high yield bond underwritings resulting from its merger and acquisition activities which DBL and Milken were having difficulty marketing." *Id.* ¶ 88(c). The plaintiffs allege that defendants were all "direct, necessary and substantial participant[s]" in a conspiracy to "enable New

---

1. Although the above-captioned suits were filed separately, a single Amended Class Action Complaint was filed for all three. A fourth class action complaint, substantially similar to those under consideration here, was filed on December 4, 1990. *Posner v. The New America High Income Fund*, Civil Action No. 90–12914–MA.

2. Drexel Burnham Lambert, Inc., was originally joined as one of the lead underwriter defendants. After Drexel filed a petition for bankruptcy, the complaint was amended to omit it as a defendant. Milken, who was throughout the relevant time period head of Drexel's high-yield bond department, was retained as an individual defendant, presumably because he played a major role in the violations alleged in the amended complaint.

America to complete the IPO and to inflate and maintain the price of New America stock by issuing materially false and misleading information." *Id.* ¶ 14(a). The false and misleading communications mentioned specifically in the complaint include the prospectus, the President's Letter accompanying the Fund's Annual Report for the fiscal year ended December 31, 1988 (issued March 10, 1989), and the Semi-Annual Report of June 30, 1989, issued sometime in July, after the revelations about the fragility of the junk bond market.[3] These communications are actionable, plaintiffs allege, because defendants knew at the time these statements were issued that they were in themselves materially misleading to prospective shareholders or failed to correct misleading impressions attributable to prior statements.

In general terms, plaintiffs claim that defendants "glowing representations as to the Fund's future prospects and reassurance as to its ability to maintain the high yield of return on an investment in the Fund," *id.* ¶ 88, were actionably misleading. More specifically, the complaint groups the defendants' purportedly misleading statements into five categories.

First, the defendants misled the Plaintiff Class by understating the actual risk of default associated with junk bonds and overstating the potential rewards associated with them. "The studies used by DBL in support of its default statistics had not adequately accounted for bond exchanges, the effect of aging bonds, and the potential or likelihood of increased future defaults from companies issuing bonds used to finance mergers or acquisitions." *Id.* ¶ 88(a).

Second, defendants failed to disclose that the market for high-yield bonds was dependent on "a network of purchasers ('the inner circle') of high yield bonds" that Milken had created and "upon whom he could rely to purchase significant portions of DBL's offerings." *Id.* ¶ 88(b).

Third, "the 'high yield' bonds which were purchased by the Fund were not selected on the basis of a professional effort to maximize investment potential and to protect the shareholders through diversification," but instead were chosen pursuant to the conspiracy to create a market of last resort for Drexel's bonds. *Id.* ¶ 88(c).

Fourth, defendants failed to disclose "significant risks with respect to the high yield bonds which comprised the assets of the Fund" and the vulnerability of the Fund's entire portfolio caused by its being "skewed toward the higher risk end of the high yield bond market since it contained those bonds which were not favorably received by DBL's best customers." *Id.* ¶ 88(d).

Fifth, defendants failed to disclose their "knowledge that so-called 'bid prices' for high yield bonds were artificially inflated." *Id.* ¶ 88(e).

### B. Standard for Dismissal

At this stage of the litigation, the court is required to view the allegations in the light most favorable to the plaintiffs, and a complaint can be dismissed only if it appears beyond doubt that plaintiffs can prove no set of facts which would entitle them to relief. *Lessler v. Little,* 857 F.2d 866, 867 (1st Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989). Thus, for the purpose of analyzing the plaintiffs' claims, the court will accept the complaint's allegations and proceed on the assumption that the defendants were indeed active participants in a scheme to provide a market for the bonds that Drexel was having trouble selling and that New America was created in furtherance of that scheme.

### II. MISREPRESENTATIONS IN THE PROSPECTUS

#### A. Section 11 Violations

In Count I of the amended complaint, the putative IPO Subclass asserts a cause of

---

**3.** In their brief, plaintiffs also characterize as "communications" the directors' declaration of monthly dividends of 15 cents on April 18, 1988; 12.5 cents on November 10, 1988; 11.8 cents on June 6, 1989; 11.5 cents on July 10, 1989; and the "slashed" ten-cent dividend of October 6, 1989. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss at 30–31 [hereinafter Plaintiffs' Brief].

action under § 11 of the Securities Act of 1933, 48 Stat. 74, as amended, 15 U.S.C. § 77k, against New America, Ostrander Capital, the directors, and the underwriters.[4] Section 11 provides a cause of action for any person acquiring a security issued in connection with a registration statement, any part of which, when it became effective, "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading," against any director or underwriter. 15 U.S.C. § 77k(a).

As set forth above, plaintiffs list several species of misrepresentations and omissions for which, they assert, defendants should be held liable. In light of the lenient requirements of a complaint under Rule 12(b)(6) scrutiny, I find that the plaintiffs' allegations are sufficient to withstand a motion for dismissal.

■■■ The complaint alleges that the prospectus misrepresented the risks associated with the high-yield bonds in which the Fund would primarily invest.[5] To the extent that plaintiffs predicate liability on defendants' alleged misrepresentations with respect to the high-yield bond market in general, their claim is rejected. Defendants cannot be held liable for creating the impression that investments in junk bonds or an investment in New America would be risk free. In the first place, investors are presumed to know the basic risks of the stock market, *Zerman v. Ball*, 735 F.2d 15, 21 (2d Cir.1984), and mere sales talk is not actionable. *Cf. Shamsi v. Dean Witter Reynolds, Inc.*, 743 F.Supp. 87, 92 (D.Mass. 1989) (stating that under Rule 10b–5 "[s]uch hyperbole is considered mere sales hype or puffery, and is not the sort of representation which could deceive a reasonable investor"). Furthermore, I find that the defendants adequately disclosed the risks associated with the common stock: the prospectus itself clearly warned that junk bonds were risky and that an investment in New America was not for everyone.[6] Finally, the federal securities

---

**4.** In their brief, plaintiffs withdrew their § 11 claim against defendant Milken. Plaintiffs' Brief at 39.

**5.** Paragraph 47 of the amended complaint quotes the following language from the prospectus: "The Fund will invest primarily in fixed-income securities rated in the lower categories by established rating agencies (consisting principally of fixed income securities rated "BB" or lower by S & P[) ] or non-rated securities of comparable quality." The complaint omitted the immediately following sentence from the same paragraph of the prospectus: "Lower rated and non-rated fixed-income securities are subject to a greater degree of risk than higher rated securities." Prospectus at 3. (Perhaps by mistake, the complaint failed even to indicate the omission by ellipses. While not a requirement, the interests of completeness and a fair understanding of the context in which the alleged misrepresentations were made would seem to call for reproduction of the complete quotation.) To explain why this statement was misleading, the complaint further states, "As the Prospectus correctly note [sic.], historically, these bonds were frequently issued by corporations which were in the growth stage of their development. In contrast, the vast majority of the bonds which the Fund would purchase were issued to facilitate the financing of mergers and acquisitions, thus, the likelihood of default increased." Amended Complaint ¶ 51.

**6.** In deciding this motion to dismiss, I have considered the claims in light of the entire prospectus, which defendants attached as an exhibit to their brief. Where, as here, a document is central to the plaintiff's claim, the court may consider that document in a motion to dismiss without treating the motion as one for summary judgment or allowing the plaintiff an opportunity to submit additional evidence. *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988).

The prospectus repeatedly stated that the high-yield securities in which the Fund would invest "are regarded by S & P, on balance, as predominantly speculative with respect to capacity to pay interest and repay principal in accordance with the terms of the obligation and will generally involve more credit risk than securities in the higher rating categories." Prospectus at 1, 5–6, 18. The prospectus stated in at least two places, "Investors should carefully consider their ability to assume the foregoing risks before making an investment in the Fund. An investment in shares of the Fund may not be appropriate for all investors." *Id.* at 6, 19.

In addition to disclosing the risks associated with junk bonds, the prospectus was also candid with respect to the qualifications of the investment adviser and underwriters. The adviser, it said, "has a limited professional staff and is dependent to a significant degree upon the services of Patricia Ostrander, who has not previ-

laws do not provide a cause of action for mismanagement or breach of fiduciary duty. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479–80, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977). Thus, statements that created the impression that the Fund would be professionally managed, Amended Complaint ¶ 88(c), or that New America bought bonds at inflated bid prices, *id.* ¶ 88(e), cannot be the basis for claims under the federal securities laws.[7] These allegations are pertinent only insofar as they indicate defendants' awareness and participation in the underlying conspiracy.

■ With such allegations accordingly discounted, however, the complaint still succeeds in alleging the basis of a claim under § 11. First, the prospectus quoted the "DBL Composite" as an authoritative source on the performance of the high-yield market.[8] I do not hold that defendants have an obligation to correct the statements of others, and I make no conclusion with respect to the historical accuracy of the DBL Composite. *See Backman v. Polaroid Corp.,* 910 F.2d 10, 16–18 (1st Cir. 1990) (en banc) (discussing duty to update statements with "forward intent" as distinguished from statements of historical fact).

If, however, defendants were aware when they issued the prospectus that New America would invest in Drexel's least desirable bond issues, particularly those related to mergers and leveraged buyouts, then sophisticated financiers like the defendants should have known that the DBL Composite did not accurately reflect the investments that the Fund would be making. In that case, the use of the DBL Composite may have been materially misleading. Second, statements in the prospectus that the Fund would make use of "temporary defensive investment strategies" and "hedging techniques" to reduce risk, Amended Complaint ¶¶ 49–50, would also have been misleading if the defendants, determined that the Fund would serve as Drexel's market of last resort, knew that they would never use such techniques. Third, the prospectus may have led investors to believe that New America would invest primarily in bonds from "growth stage" companies, when defendants knew its activities would focus on bonds issued in connection with mergers and takeovers, a riskier segment of the market. *See id.* ¶ 51.

I reiterate that § 11 liability, if any, is based neither on the prospectus's failure to

---

ously sponsored or managed a closed-end investment company." *Id.* at 5. The prospectus also disclosed that Drexel's activities, including those in high-yield securities, were under SEC investigation, that Drexel had produced documents in response to grand jury subpoenas, and that some of its employees had testified before the grand jury. *Id.* at 6.

7. Plaintiffs also find fault with the statements in the prospectus regarding the S & P ratings of the senior debt: "The Fund's investments will be subject to diversification, liquidity and related guidelines established in connection with the Fund's receipt from S & P of a rating of 'AAA' for the Notes and a rating of 'AA +' for the Preferred Shares.... S & P will issue these investment grade ratings because the Fund's portfolio, although consisting principally of lower rated securities, will be managed in accordance with the foregoing guidelines...." Amended Complaint ¶ 47. Plaintiffs claim that these statements created the impression that the common stock would somehow benefit from these ratings. *See id.* ¶ 55. But these allegations are groundless in light of the plain statement on page 1 of the prospectus: "Investors should note that the risks associated with an investment in the Common Stock are not miti-

gated by the existence of [the S & P] ratings with respect to the Notes and the Preferred Shares."

8. Paragraph 52 of the complaint quotes from the portion of the prospectus that discussed figures reported in the DBL Composite as of December 31, 1987. These figures reported the spread between the yields of high-yield bonds and U.S. Treasury securities, the default rate of high-yield bonds between 1977 and 1986 (0.97%) and for 1987 (1.25%), and the "net average spread between 'high yield' securities and representative U.S. Treasury securities" after adjusting for defaults, which was reported as a 2.96% higher yield for junk bonds for that period. The figures were followed by the disclaimer (not omitted from the complaint), "However, past performance is not necessarily indicative of future performance."

The prospectus portrayed these figures as indicative of the Fund's future performance. "The capital structure of the Fund has been designed to take advantage of the historical spread in yields between 'high yield' securities and representative U.S. Treasury securities compared with the average default loss on 'high yields' [sic.] securities." Amended Complaint ¶ 53.

predict the future nor on the defendants' poor management of the Fund; any liability must be based on statements that the defendants knew or should have known to be false or misleading. Thus, discovery should focus on what the prospectus represented to be true compared with what the defendants knew to be true at the time they issued the prospectus.

## B. Section 12(2) Violations

In Count II, the IPO Subclass makes a claim against New America, Ostrander Capital, the directors, and the defendant class of underwriters,[9] under § 12(2) of the Securities Act, 15 U.S.C. § 77*l* (2).

Section 12(2) provides that any person who

> offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ... shall be liable to the person purchasing such security from him....

■ The same statements in the prospectus upon which § 11 liability might be based likewise comprise a sufficient basis for a claim under § 12(2). Section 12(2) differs from § 11, however, in the classes of defendants that may be held liable. Section 12(2) creates liability only for a person who "offers or sells" securities issued in conjunction with a misleading prospectus. Applying the appropriate standard of scrutiny for a Rule 12(b)(6) motion, a set of facts establishing the underwriter defendants as "sellers" is clearly plausible, although the plaintiffs must later produce facts to prove the underwriter defendants' actual participation in sales activity. *See In re Worlds of Wonder Sec. Litig.*, 721 F.Supp. 1140, 1148 (N.D.Cal.1989).

■ Whether the directors qualify as "sellers" within the meaning of § 12(2) is not so evident. In *Pinter v. Dahl*, 486 U.S. 622, 647, 108 S.Ct. 2063, 2078–79, 100 L.Ed.2d 658 (1988), the Supreme Court held that liability under § 12(1) "extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Plaintiffs allege that New America "through direct meetings with potential investors, brokers or investment analysts solicited the purchase of the securities by members of the IPO Subclass, motivated by a desire to serve their own financial interests." Amended Complaint ¶ 99(c). Assuming that the *Pinter*'s holding with regard to "sellers" under § 12(1) applies to § 12(2), *see Pinter*, 486 U.S. at 642 n. 20, 108 S.Ct. at 2076 n. 20; *Loan v. Federal Deposit Ins. Corp.*, 717 F.Supp. 964, 968 n. 8 (D.Mass.1989), I cannot dismiss this claim as to the individual directors at this time. Again, plaintiffs' discovery should focus on the existence of evidence of solicitation with respect to each individual defendant.

## C. Statute of Limitations

■ Defendants argue that these actions are barred by the statute of limitations. Actions for violations of §§ 11 or 12 must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The first complaint in this matter was filed on March 27, 1990, which is within one year of the date that the Asquith study, the first of the revelations that arguably should have put the plaintiffs on notice, was publicized.

Defendants claim, however, that there were "storm warnings" to alert the plaintiffs of the possibility of misleading statements as early as the day the prospectus was filed, *see Cook v. Avien, Inc.*, 573 F.2d 685, 697 (1st Cir.1978), and, therefore, that

---

**9.** Plaintiffs have also withdrawn their § 12(2) claim against defendant Milken. Plaintiffs' Brief at 39.

the one-year period had expired before the complaint was filed. I disagree. If the prospectus was indeed misleading as to the kind of activity in which New America intended to engage and the nature of the bonds in which it would invest, plaintiffs had no reason to suspect the candor of the prospectus before the first revelations about the true default rates of junk bonds—and perhaps not until much later. If I am to believe plaintiffs' allegations, which I must at this juncture, I cannot conclude anything but that the complaint satisfies the statute of limitations.

### III. RULE 10b–5 AND THE COMMON–LAW CLAIMS

Count III of the complaint alleges, on behalf of the entire Plaintiff Class, that all defendants violated § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U.S.C. § 78j(b), and the Securities and Exchange Commission's Rule 10b–5, 17 C.F.R. § 240.10b–5 (1990),[10] by their misleading statements made in conjunction with the prospectus (discussed above), and by further misleading statements in New America's Annual[11] and Semi–Annual[12] Reports. Counts IV and V of the complaint, respectively, allege common-law actions for negligent misrepresentation and fraud.

**10.** Rule 10b–5 provides, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

\* \* \* \* \* \*

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,

\* \* \* \* \* \*

in connection with the purchase or sale or any security.

**11.** Plaintiffs fault the President's Letter in the Annual Report for statements, such as the following, which maintained the illusion of defensive management techniques: "Limiting the volatility of New America's net asset value continued to be a primary focus of management. Since the Funds's last shareholder letter, management has further shifted the portfolio toward high yield debt instruments that have

■ Rule 10b–5 makes unlawful the use of fraudulent or deceitful conduct in connection with the purchase or sale of a security. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). But Rule 10b–5 does not require full disclosure of all facts that an investor would find material. "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980). A duty to speak under 10b–5 arises from trading on insider or confidential information, from statutes or regulations requiring disclosure, or from a need to correct prior inaccurate, incomplete, or misleading statements. *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26–27 (1st Cir.1987). In *Roeder*, the First Circuit held that, where plaintiff had not alleged any prior incomplete, inaccurate, or misleading statements, the defendant corporation's officers and directors were under no obligation to disclose that they had engaged in bribery to obtain subcontracts. Similarly, the defendants in the instant case cannot be liable merely for failing to disclose Milken's "inner circle," the inflated bond prices, and the alleged conspiracy in general. De-

defensive characteristics." Amended Complaint ¶ 61.

**12.** Paragraph 72 of the complaint quoted the Semi–Annual Report as stating that the common stock was paying lower dividends than expected because more funds were needed to pay dividends to the preferred shareholders than had been anticipated: "Since the [Preferred Shares'] dividend is significantly higher than it was at the Funds' inception, there is slightly less income available for common share dividends." The last sentence of ¶ 72 states, "The reason [given] for the Fund's lowering of the dividend was materially misleading because, in actuality, the increase in the default rate of the underlying issuers of the bonds which the Fund purchased had a material effect on the value of its portfolio." Plaintiffs cite as other deficiencies in the Semi–Annual Report that "the Fund continued to tout the benefits of purchasing junk bonds," Amended Complaint ¶ 73, and that "the Letter left investors with the impression that over the long-term the high yield market will provide 'superior' returns to investors." *Id.* ¶ 74.

fendants had a duty to disclose these facts only inasmuch as their public statements created an inaccurate impression of New America's business dealings. Consistent with my previous finding that defendants adequately disclosed the riskiness of high-yield securities, the defendants' misleading statements reduce to (1) concealing their allegedly known intention to use New America as Drexel's customer of last resort and to concentrate its investment activity on high-yield securities issued in connection with mergers and takeovers [13]—but only inasmuch as these facts rendered misleading their general representations about the high-yield bond market; (2) falsely representing their intention to use defensive investment strategies; and (3) misrepresenting the true reasons for the decline in common-stock dividends.

In developing the law of Rule 10b–5, the courts have often relied on analogies from the law of torts. *See, e.g., Santa Fe Indus.*, 430 U.S. at 471–77, 97 S.Ct. at 1299–03; *Blue Chip Stamps*, 421 U.S. at 744–49, 95 S.Ct. at 1929–31; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 253, 108 S.Ct. 978, 994–95, 99 L.Ed.2d 194 (1988) (White, J., concurring in part and dissenting in part) (stating that "the case law developed in this Court with respect to § 10(b) and Rule 10b–5 has been based on doctrines with which we, as judges, are familiar: common-law doctrines of fraud and deceit"). Drawing one such analogy, the Seventh Circuit in a recent opinion explicitly held that the principal of loss causation—"the common law's universal requirement that the tort plaintiff prove causation"—is a necessary element of a Rule 10b–5 claim. *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir.) (Posner, J.), *cert. denied,* —— U.S. ——, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). And, of course, causation is an

element of the common-law tort of fraud or deceit, *see, e.g., Connelly v. Bartlett,* 286 Mass. 311, 315, 190 N.E. 799, 801 (1934) ("Where a plaintiff does not prove that he is worse off than if there had been no misrepresentation he has not made out a case of deceit."), or any action based on negligence. *See Restatement (Second) of Torts* § 430 (1965) (defendant's negligence cannot be the basis of a plaintiff's recovery unless the negligence is the legal cause of the injury).

In *Bastian*, the Seventh Circuit upheld the district court's dismissal for failure to state a claim of a Rule 10b–5 action brought by an investor in an oil and gas limited partnership. The plaintiff had alleged that he would not have invested in the defendants' company, but for the defendants' fraudulent misrepresentations about their competence and integrity. The court held that such allegations did not amount to a proper pleading of loss causation. "The plaintiff must allege and prove that, but for the defendants' wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Bastian*, 892 F.2d at 685. It was not enough for plaintiffs to say that they would not have made the investment; rather, they were required to plead that they would not have lost their investment had the facts been as defendants had represented them. The court suspected that the loss had been caused not by the defendant's dishonesty or incompetence, but by the decline in price of domestic oil. "If the plaintiffs would have lost their investment regardless of the fraud, any award of damages to them would be a windfall." *Id.* at 684–85.

■ Accordingly, I find that the putative Plaintiff Class's Rule 10b–5 claim, as well as their common-law claims, fail because nothing in the complaint claims, or can be

---

**13.** To the extent that plaintiffs claim that New America misled them by stating it would focus its high-yield investment activity in the safer "growth-stage" securities rather than those issued in connection with mergers and leveraged buyouts, the President's Letter of March 30, 1989, would have disabused any reasonable investor of this belief. As the complaint says, "Ostrander noted that the growth in the High Yield Market would continue because leveraged financings are expected to continue into the future." Amended Complaint ¶ 62. The letter went on to boast that the leveraged buyout of RJR Nabisco alone would add $11 billion of new securities to the junk bond market. It should have been apparent to stockholders by this point that mergers and takeovers would have to be a focus of New America's future high-yield investment activities.

fairly construed as claiming, that defendants' statements or omissions were the cause of plaintiffs' injury. Plaintiffs attempt to establish this causal relationship by pleading that as a result of defendants' willful and reckless deception, the common stock sold at artificially inflated prices. While the plaintiffs' invocation of the "fraud-on-the-market" theory may be relevant to relieve them of the burden of proving reliance, *Roeder*, 814 F.2d at 27, reliance cannot be equated with causation. *See Basic Inc.*, 485 U.S. at 251, 108 S.Ct. at 993 (White, J., concurring in part and dissenting in part) (noting that plurality opinion "rejects the version of [fraud-on-the-market] theory ... which equates 'causation' and 'reliance'"). *Cf. Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380 & n. 11 (2d Cir.1974) (distinguishing between "loss causation" and "transaction causation" and stating that reliance is relevant to the latter), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Plaintiffs do not demonstrate loss causation by saying they would not have bought New America stock had they known the truth; they must allege that they would not have suffered the loss absent the misrepresentations in the prospectus and in the later public statements. They must allege that they were injured because the risks that materialized were the risks of which they were unaware as a result of defendants' misleading statements, not the risks of which they were fully aware. This is not what they claim.

The cause of their loss, as stated repeatedly in the complaint, was the decline of the high-yield bond market. *See, e.g.*, Amended Complaint ¶ 68 ("junk bond market began to tumble"); *id.* ¶ 75 (disclosures of "increase in junk bond defaults"); *id.* ¶ 78 ("the quoted prices at which junk bonds were reportedly selling became severely depressed"); *id.* ¶ 79 (study indicates that "junk bonds were not as lucrative as investors and traders had been led to believe"); *id.* ¶ 80 ("collapse in the price of junk bonds"). Plaintiffs knew full well that their investment was subject to the vagaries of this market. Plaintiffs do not allege—as they must to plead loss causa-

tion—that the decline of New America was caused by the directors' investing in merger and takeover bonds rather than "growth-stage" bonds or by their failing to use defensive tactics. If every public statement the defendants made had been true, and the price of the stock had not been artificially inflated, the plaintiffs would have sustained the same injury. Under these circumstances, it cannot be said the defendants' fraud was the cause of plaintiffs' loss.

In their brief, plaintiffs argue that "a response in the market price to disclosure of fraudulently concealed information proves loss causation." Plaintiffs' Brief at 54. *See, e.g., Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 577 (2d Cir.) (holding that market response must be considered in calculating damages under § 10(b)), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982); *Akerman v. Oryx Communications, Inc.*, 609 F.Supp. 363, 370 (S.D.N.Y.1984) (market decline is "obvious evidence of a causal relationship between a misstated fact and a stock's inaccurate valuation"), *aff'd in part*, 810 F.2d 336 (2d Cir.1987). But even if plaintiffs' argument is correct, the complaint simply does not claim that the price of New America stock dropped because the information fraudulently concealed suddenly came to light. New America failed, as the complaint states, because of "the increase in the default rate of the underlying issuers of the bonds which the Fund purchased." Amended Complaint ¶ 72.

The complaint comes closest to stating a *bona fide* claim under Rule 10b–5 in this final sentence of ¶ 72. If, as this one sentence at the end of one paragraph in this 119–paragraph complaint alleges, there had been "an increase in the default rate of the underlying issuers of the bonds which the Fund [had] purchased," the Semi–Annual Report's attribution of the decline in dividends to unanticipated expense in paying dividends on the Preferred Shares would have been materially misleading. It is even possible to imagine from this scenario the crucial element of loss causation. The facts concealed—the increase in defaults—

might indeed have caused losses for whatever percentage of the Plaintiff Class relied on statements in the Semi–Annual Report, which was issued "[i]n or about July, 1989" (just three months prior to the closing of the class period). *Id.* The fatal flaw in this allegation, as in the bulk of the those that comprise the 10b–5 claim, is the complaint's failure to specify that the decline of New America's common stock was caused by the default of particular junk bonds—those that New America held—rather than the decline in the junk bond market as a whole. While the court must read complaints liberally, the interests of fairness and justice do not require a court to squeeze a valid claim out of such massive and detailed pleadings as those before me. "The court need not conjure up unpled allegations or contrive elaborately arcane scripts" in order to rule on a Rule 12(b)(6) motion. *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988).

My holding that plaintiffs fail to state a cause of action under Rule 10b–5 is not inconsistent with my refusal to dismiss the claims under § 11 and § 12(2). Section 12(2) does not require the plaintiff to prove causation, *see* 15 U.S.C. § 77*l* (violators "*shall* be liable") (emphasis added); *Bastian*, 892 F.2d at 685 (stating that § 12(2) permits "windfall recoveries"), and under § 11, lack of causation is an affirmative defense. *See* 15 U.S.C. § 77k(e) (stating that damages will be reduced by such amount that defendant can prove "represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted").

It is clear what spurred this complaint. Michael Milken and Drexel Burnham Lambert have been exposed as participants in what has turned out to be one of the great Wall Street scandals of the 1980's—the junk bond phenomenon—and their fingerprints are all over New America's prospectus. The plaintiffs have theorized a scenario to link the directors and other underwriters of New America directly to Milken and Drexel. Plaintiffs cannot be blamed for seeking redress for the wrongs they have suffered, but, having knowingly gambled in the high-yield market, attempting to ride the coattails of Milken and Drexel, they cannot now be heard to complain too loudly. Judge Posner's observations with regard to the *Bastian* case are apropos here:

> No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through offering memoranda with a fine-tooth comb in the hope of uncovering a misrepresentation. Defrauders are a bad lot and should be punished, but Rule 10b–5 does not make them insurers against national economic calamities.

*Bastian*, 892 F.2d at 685.

## IV. CIVIL RICO

The Plaintiff Class asserts two Racketeer Influenced and Corrupt Organizations Act (RICO) claims under 18 U.S.C. § 1964(c), against defendant Milken in Count VI and against the directors, the underwriters, and Ostrander Capital in Count VII. In the latter, plaintiffs allege that the defendants (except Milken) made use of New America as the enterprise through which they engaged in a "pattern of racketeering activity." *See id.* § 1962(c). In the former, plaintiffs allege that Drexel was the enterprise through which Milken did the same.

A "pattern of racketeering," as defined in 18 U.S.C. § 1961(1), "requires at least two acts of racketeering activity," and racketeering activity includes "any offense involving ... fraud in the sale of securities." *Id.* § 1961(1)(D). The court having already ruled out liability under Rule 10b–5, the New America defendants' alleged racketeering activity reduces to the publication of the prospectus. Plaintiffs' claim therefore fails to satisfy the definition of a "pattern of racketeering" because the publication of the prospectus does not comprise "at least two acts" of racketeering. Nor does the Plaintiff Class, on the basis of this single, isolated act, allege a "pattern" of activity that "amounted to, or threatened the likelihood of, continued criminal activity." *H.J. Inc. v. Northwest-*

*ern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989); *see also Fleet Credit Corp. v. Sion,* 893 F.2d 441, 446–47 (1st Cir.1990) (applying *H.J. Inc.* to determine whether a pattern of racketeering was alleged). Count VII against the New America defendants is therefore dismissed.

 Count VI, ¶ 124 of the complaint alleges that Milken participated in a pattern of racketeering activity consisting of his and Drexel's repeated acts of mail fraud, wire fraud, and securities fraud. These acts are supposedly encompassed in ¶¶ 23–43 of the complaint, which sketch Drexel's role in the "evolution of the junk bond market." These paragraphs, however, fall short of alleging the predicate acts of racketeering necessary to comprise a RICO violation. For example, nowhere in these paragraphs does the complaint specify that Drexel's communications involved use of the mails or wires. *See Fleet,* 893 F.2d at 444–45 (faulting a complaint for the same omissions). The complaint is similarly deficient with regard to Drexel's acts of securities fraud.

 Even if I were to hold that the complaint adequately alleged the predicate acts, I still would reject the Plaintiff Class's RICO claim against Milken. The statute requires a plaintiff to show injury to business or property "by reason of" the racketeering activity. 18 U.S.C. § 1964(c). The complaint alleges, in general terms, that Milken through Drexel engaged in a course of racketeering activity to create and sustain the junk bond market. The members of the Plaintiff Class, however, did not purchase junk bonds—they bought common stock in New America. The causal connection between their loss as purchasers of New America stock and Milken's racketeering activities is simply too remote to allow this claim to go forward. The Plaintiff Class's allegations do not demonstrate that Milken's behavior caused their loss any more than it caused loss to countless others who were indirectly injured in the junk bond market. Count VI against Milken is therefore dismissed.

ORDER

Defendants' motion to dismiss is DENIED with respect to Counts I and II, alleging violations of §§ 11 and 12(2) of the Securities Act. Defendants' motion to dismiss is ALLOWED with respect to all other counts. Accordingly, judgment will be entered in favor of defendant Milken and against all plaintiffs other than the representatives of the putative IPO Subclass.

This order leaves intact what I believe to be the core of plaintiffs' federal claims. It does, however, involve a controlling question of law as to which there is substantial ground for difference of opinion. Given New America's questionable pedigree, the vigor with which legal battles such as these are usually fought, the amount of money at stake, and the time and expense likely to be involved—combined with the likelihood of eventual appeal and the present need to fix the Plaintiff Class with some certainty—I further find, pursuant to 28 U.S.C. § 1292(b), that immediate appeal from this order would materially advance the ultimate termination of this litigation.