In re WASHINGTON PUBLIC POWER
SUPPLY SYSTEM SECURITIES
LITIGATION.

MDL No. 551.

United States District Court,
W.D. Washington,
Second (Seattle) Division.

Dec. 20, 1986.

---

Paul M. Bernstein, Chairperson, Bernstein, Litowitz, Berger & Grossman, New York City, Greenfield, Chimicles & Lewis, Richard D. Greenfield, Haverford, Pa., for plaintiff Henry Puchall.

Melvyn I. Weiss, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, for plaintiff Joseph Harris.

James R. Irwin, Shidler, McBroom & Gates, Seattle, Wash., for plaintiffs David Gold and Marvin Frankel.

Michael Mines (Ex-officio), Betts, Patterson & Mines, Seattle, Wash., for plaintiff Chemical Bank.

Richard A. Cirillo, Rogers & Wells, New York City, for defendants.

Graham & Dunn, Bruce M. Pym, Seattle, Wash., for various class plaintiffs.

Rabin & Silverman, Allan K. Peckel, Kaufman, Malchman & Kirby, P.C., New York City, for plaintiffs David Gold and Marvin Frankel.

Berger & Montague, P.C., David Berger, Philadelphia, Pa., for plaintiff Rosalyn Mirotznik.

Wolf Popper Ross Wolf & Jones, Stephen D. Oestreich, New York City, for plaintiff Morris Massry.

Goodkind, Wechsler & Labaton, Stuart D. Wechsler, New York City, and Wolfstone, Panchot, Bloch & Kelley, J. Porter Kelley, Seattle, Wash., for plaintiff Paul J. Bonseigneur.

Barrack, Rodos & Bacine, Gerald Rodos, Philadelphia, Pa., for plaintiff Dr. Howard Sheldon.

Schoengold & Sporn, P.C., Samuel P. Sporn, New York City, for plaintiff Jack Schroeder.

David B. Gold, P.A., David B. Gold, San Francisco, Cal., Pomerantz, Levy, Haudek, Block & Grossman, Stanley Grossman, Stephen P. Hoffman, New York City, Thomas M. Geisness, Inc., P.C., James A. Doherty, Seattle, Wash., for plaintiff Leonard Laub.

Meredith & Cohen, P.C., Joel C. Meredith, Philadelphia, Pa., Alan Neigher, Westport, Conn., for plaintiff Louis Brazen and 776 Broadway.

Wolf Haldenstein Adler Freeman & Herz, Daniel W. Krasner, New York City, for plaintiff-intervenor Schein.

Harvey Greenfield, Kaufman, Malchman & Kirby, Irving Malchman, New York City, Franco, Asia, Bensussen & Finegold, Benjamin S. Asia, Seattle, Wash., for plaintiff Bryna Stepak.

Wolf, Block, Schorr & Solis-Cohen, Barry F. Schwartz, Philadelphia, Pa., for plaintiff Danny S. Fruchter.

Stull, Stull & Brody, Jules Brody, New York City, for plaintiff Lawrence Zucker.

Sachnoff Weaver & Rubenstein, Ltd., Lowell E. Sachnoff, Chicago, Ill., for Martin Woolin.

Saveri & Saveri, Guido Saveri, O'Brien & Hallisey, A Professional Corp., Jeremiah F. Hallisey, San Francisco, Cal., for plaintiff The Doctors Co.

Much Shelist Freed Denenberg Ament & Eiger, P.C., Lawrence H. Eiger, Chicago, Ill., for plaintiff Ruth C. Sigmund, Trustee of Arthur W. Sigmund Residuary Trust and the Arthur W. Sigmund Marital Trust.

Bader & Bader, I. Walton Bader, White Plains, N.Y., for Malcolm Pine.

Albert R. Malanca, Donald S. Cohen, Kenneth G. Kieffer, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Tacoma, Wash., Seattle, Wash., for Washington Public Utilities Group.

David F. Jurca, Linda Cochran, Richard White, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for Columbia defendants.

Michael F. Schumacher, Jerome Hillis, Mark Clark, Greg Keller, Hillis, Phillips, Cairncross, Clark & Martin, Seattle, Wash., for Inland Utilities.

Hugo E. Oswald, Jr., Stevan Phillips, Margaret Pageler, Jones, Grey & Bayley, Seattle, Wash., for Wahkiakum defendants.

Larry S. Gangnes, John Tomlinson, H. Peter Sorg, Jr., Lane, Powell, Moss & Miller, Seattle, Wash., for Oregon Public Entities.

Everett B. Clary, Donald Wessling, O'Melveny & Myers, Los Angeles, Cal., for Certain Washington Public Power Supply System Director defendants.

Dennis K. Bromley, George Sears, Robert Gordon, Pillsbury, Madison & Sutro, San Francisco, Cal., for Snohomish Group.

John D. Lowery, Thomas Burt, Thomas Hamerlinck, Riddell, Williams, Bullitt & Walkinshaw, Seattle, Wash., for Small Utilities Group.

Malcolm S. Harris, John Mericle, Harris, Mericle, Orr & Bariault, Seattle, Wash., for Member Non-Participants.

Camden M. Hall, Foster, Pepper & Riviera, Seattle, Wash., for Member Non-Participants and City of Seattle, Wash.

Robert D. Stewart, David J. Lenci, Culp, Dwyer, Guterson & Grader, Seattle, Wash., for Washington Public Power Supply System.

Mark C. Rutzick, U.S. Dept. of Justice, Portland, Or., for U.S.—Bonneville Power Admin.

Irwin J. Sugarman, Robert Abrahams, Schulte, Roth & Zabel, New York City, for Law Firm defendants.

Otto G. Klein, III, Peter Danelo, Syrdal, Danelo, Klein & Myre, Seattle, Wash., for Engineer defendants.

Herbert M. Wachtell, Peter C. Hein, Wachtell, Lipton, Rosen & Katz, New York City, for Underwriter defendants.

James J. Hagan, Robert Woody, Simpson, Thacher & Bartlett, New York City, for Blyth Eastman Paine Webber, Inc.

## ORDER

WILLIAM D. BROWNING, District Judge.

The Washington Public Power Supply System ("WPPSS") issued 2.25 billion dollars of municipal bonds in order to finance the construction of two nuclear power plants, Projects 4 and 5. Serious problems led to the eventual termination of both Projects and subsequently to the default by WPPSS on its bond obligations. This multidistrict litigation is the consolidation of various actions commenced in connection with this bond default including complaints by class plaintiffs, Chemical Bank (the bond fund trustee), and various individuals against numerous defendants, including WPPSS, the eighty-eight participating utilities (Participants), bond and special counsel, various project consultants and underwriters that sold the initial offerings of the bonds.

In creating the WPPSS bond offerings, the utilities participating in the construction of the nuclear power plants entered into Participants' Agreements which provided, inter alia, that they would repay the bonds whether or not the plants were ever completed. As stated in the Official Statements prepared in connection with the issuance of the WPPSS bonds, "Payments by the Participants are required to be made under the Participants' Agreements whether or not the Projects are operable or operating and notwithstanding the suspension, interruption, interference, reduction or curtailment of the Projects output." This "dry hole" risk agreement by the Participants was explicitly made part of the security for the bonds in the Official Statements.

Plaintiffs in this litigation seek relief, in part, based upon alleged misrepresentations regarding the ability and the willingness of the Participants to perform their obligation to pay the WPPSS bond debt. In connection with continuing efforts to simplify the litigation, this Court requested briefing on the legal feasibility of plaintiffs' securities law claims that are based upon allegations that the Participants misrepresented their ability and their willing-

ness to perform their obligation under the Participants' Agreements.

After carefully considering the extensive briefing and oral argument on these issues, the Court has concluded that plaintiffs should be allowed to proceed with their claims based on the allegation of misrepresentations regarding the Participants' ability and willingness to fulfill their "dry hole" obligations. To the extent that these alleged misrepresentations can be shown to have resulted in payment of an inflated price for the bonds, such misrepresentations may be found to be the direct and proximate cause of injury to plaintiffs and therefore compensable under the securities laws. Before reaching the causation analysis, however, three preliminary issues raised by defendants, the actionability of projections, the actionability of secret intent and materiality, should be addressed.

## DISCUSSION

### I. ACTIONABILITY OF PROJECTIONS

■ Defendants contend that any representations regarding the ability and willingness to pay are based upon predictions, and thus involve a statement of opinion. Opinions are generally not actionable as they are not misstatements of fact. However, projections, forecasts and opinions are actionable in some circumstances. *Eisenberg v. Gagnon,* 766 F.2d 770, 775 (3d Cir.1985). Thus, "an opinion that has been issued without a genuine belief or reasonable basis is an 'untrue' statement which, if made knowingly or recklessly, is culpable conduct actionable under Section 10(b) and Rule 10b–5." *Id.* at 776. The Ninth Circuit has held that a jury may find that a defendant "by ignoring facts seriously undermining the accuracy of the forecast, failed to meet the duty imposed by Section 10(b)." *Marx v. Computer Sciences Corporation,* 507 F.2d 485, 490 (9th Cir.1974). Similarly, in *Eisenberg v. Gagnon,* 766 F.2d 770 (3d Cir.1985), an action that was brought against the promoters of a coal mine tax shelter for misrepresentations made in a prospectus regarding the tax status, coal reserves and ability to mine, the Third Circuit held that culpability with respect to projections may be established if

it is shown that the defendants did not have an informed and reasonable belief in the reliability of their representations. *Id.* at 776.

■ Accordingly, plaintiffs' allegations that defendants' projections regarding the Participants' ability to pay were fraudulent and that defendants had, or should have had, reason to doubt the accuracy of the projections state a cause of action under the securities laws.

### II. ACTIONABILITY OF SECRET INTENT

■ The underwriter defendants decline to address the willingness to pay issue claiming that they could not have been expected to know the undisclosed intentions of the Participants. The knowledge, however, that these defendants had or should have had raises a question of fact that is properly reserved for proof at trial. As a matter of law, the Ninth Circuit has held that "[e]ntering into a contract of sale with the secret reservation not to fully perform it is fraud cognizable under Section 10(b)." *Walling v. Beverly Enterprises,* 476 F.2d 393 (9th Cir.1973). There is no rule of law that precludes plaintiffs from convincing the trier of fact of culpable behavior by these defendants regarding the secret intent of the Participants.

The Oregon defendants contend that the willingness to pay claim is irrelevant since an unwilling Participant could be forced to pay by obtaining a court order. In support of this position, they cite various cases demonstrating the use of mandamus to compel debt payment. In response, plaintiffs offer excerpts of testimony of securities experts explaining that the willingness to repay is a relevant factor of debenture valuation.

Regardless of the availability of legal process to force an unwilling party to perform its obligations under a contract, such legal recourse imposes the additional costs of delay and legal expense. Therefore the possibility of needing to invoke legal process affects the initial value of the contract since these additional costs could reduce the amount of the return. Misrepresenta-

tions as to the Participants' willingness to pay could be found to have directly affected the value of the WPPSS bonds. Such misrepresentations, therefore, would thus constitute a legally cognizable source of plaintiffs' injuries and provide a valid basis for action.

III. MATERIALITY

One group of Participant defendants (the Small Utility Group) argues that its members' individual shares of the bond package are so small as to be insignificant. On this basis, they conclude that any representations regarding their ability and willingness to pay is immaterial and that they should be dismissed with respect to these claims.

■ In addition to the fact that the issue of materiality is generally reserved for the jury, the tactic of dividing the claim into comparatively small pieces does not change the applicable law. A joint tortfeasor is a tortfeasor regardless of the size of its contribution to the injury. It is noteworthy that these "comparatively small" shares account for, in the aggregate, approximately 146.5 million dollars of WPPSS bonds. Even the smallest of these defendants has a share of approximately 10 million dollars of WPPSS bonds. That this materiality argument is raised at all based on the "insignificance" of 10 million dollars is an indication of the enormity of this litigation.

■ As a matter of law, it is well established that "[t]he test for materiality is whether there is a substantial likelihood that a reasonable investor would consider the fact important in making an investment decision." *Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1221 (9th Cir.1980); *Harris v. Union Electric Company,* 787 F.2d 355, 366 (8th Cir.1986); *Caravan Mobile Home Sales, Inc. v. Lehman Brothers Kuhn Loeb, Inc.,* 769 F.2d 561, 565 (9th Cir.1985); *SEC v. Seaboard Corporation,* 677 F.2d 1301, 1306 (9th Cir.1982); *Marx v. Computer Sciences Corporation,* 507 F.2d 485, 489 (9th Cir.1974). In cases in which the action is based upon an omission to disclose a fact, the standard for materiality has been relaxed to include facts that "could have

been expected to influence" the reasonable investor. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). In any event, the analysis of what would, or could, influence a reasonable investor is normally a question of fact. *SEC v. Seaboard Corporation,* 677 F.2d 1301, 1306 (9th Cir.1982) (citing *Northwest Paper Corp. v. Thompson,* 421 F.2d 137, 138 (9th Cir.1969)). *See also, Caravan Mobile Home Sales, Inc. v. Lehman Brothers Kuhn Loeb, Inc.,* 769 F.2d 561, 565 (9th Cir.1985) (suggesting that "[s]ummary judgement is normally inappropriate for determining the materiality of undisclosed information.").

In *Marx v. Computer Sciences Corporation,* 507 F.2d 485 (9th Cir.1974), a corporation failed to disclose several pieces of information regarding the financial troubles of a subsidiary in a report to its shareholders. Although the Ninth Circuit thought it unlikely that any one omission could be considered material by itself, the Circuit found that the aggregate of the omitted factors was certainly material. *Id.,* at 491–92. Accordingly, the court held that the question of the materiality of the omissions should have been submitted to the jury. *Id.*

IV. CAUSATION AND DAMAGE

■ Having dealt with the preliminary matters, we can now turn our attention to the critical causation issues raised in the present motions. In securities cases, there are two forms of causation that must be established by a plaintiff: loss causation "that the misrepresentations or omissions caused the economic harm"; and, transaction causation "that the violations in question caused the appellant to engage in the transaction in question." *Schlick v. Penn-Dixie Cement Corporation,* 507 F.2d 374, 380 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Essentially, a plaintiff must show that defendant's fraud was material to the decision to enter into the transaction and that it affected the value of the investment in such a way as to damage plaintiff.[1]

---

1. The element of transaction causation has not been raised as an issue of contention in the present motions and therefore the Court does not need to address it at this time.

■ There is an exception to this rule requiring both forms of causation in cases where "the evil is not the price the investor paid for a security, but the broker's fraudulent inducement of the investor to purchase the security." *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th Cir. 1984); *Kafton v. Baptist Park Nursing Center, Inc.*, 617 F.Supp. 349, 350 (D.Ariz. 1985). These cases typically involve the complaint that a broker is unnecessarily churning an investor's account to generate commissions. Inasmuch as the fraud has no bearing upon the value of the investment, proof of loss causation is not required since the harm is in the transaction itself. *Id.*

Plaintiffs allege that defendants misrepresented the ability and willingness of the Participants to fulfill their obligations under the Participants' Agreements in the dry hole situation. As will be discussed, misrepresentations and omissions of relevant information may have the effect of inflating the price of a security. Plaintiffs' claims of injury are based upon payment of such an inflated price. Loss causation is necessary element to these claims since the misrepresentations alleged pertain to the value of the investment.

### Price Inflation

The Participants' Agreements essentially provided a guarantee for the WPPSS bonds. The existence of such a guarantee would have the effect of reducing the risk associated with the bonds, allowing them to be sold at a higher price than they would have otherwise.[2] Plaintiffs contend that the Participants' Agreements implied that the parties were willing and able to perform their obligations thereunder. Plaintiffs argue, however, that because the Par-

ticipants did not have the ability or the willingness to pay that was indicated in the bond offering, there was a greater risk of non-payment with respect to the bonds.

If plaintiffs' allegations are proven, the bonds logically would have sold at a lower price to adjust for this increased risk. *See, Harris v. Union Electric Company*, 787 F.2d 355, 367 & n. 9 (8th Cir.1986) (finding that bonds sold at an inflated price due to misleading information in the prospectus); *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Authority*, 717 F.2d 1330, 1332 (10th Cir.1983) ("Material misinformation will theoretically cause the artificial inflation or deflation of the stock price.").[3] Plaintiffs argue that the bonds maintained a higher price because the misrepresentations of defendants prevented the market from properly assessing the value of the bonds. Plaintiffs claim the difference between what they paid and what they should have paid as the damages they sustained because of the misrepresentations.

### Loss Causation

Because plaintiffs' damages are based upon buying the bonds at an inflated price, plaintiffs must be able to prove the element of loss causation. Defendants contend that plaintiffs are unable to maintain an action on the ability and willingness to pay claims due to the absence of loss causation.

It is apparent from the inconsistencies in the case law that there is some confusion as to the meaning of loss causation. The holdings of various courts faced with securities fraud actions differ depending upon whether the court assumes a causation or a damage perspective.

---

**2.** It is well established financial theory that the price of a security varies inversely to its riskiness, all other factors being equal. *See, e.g.,* B. Malkiel, *The Inflation Beater's Investment Guide: Winning Strategies for the 1980's* 65–75 (1980); Modigliani & Pogue, "An Introduction to Risk and Return" *Financial Analysts Journal*, March-April 1974 and May-June 1974; William F. Sharpe, "Capital Asset Prices: A Theory of Market Equilibrium Under Conditions of Risk", *The Journal of Finance* 425 et. seq. (1964).

**3.** It is generally accepted that the market price of a security will reflect all available public information including any material misrepresentations. *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Authority, supra,* 717 F.2d 1330, 1332; *In re LTV Securities Litigation,* 88 F.R.D. 134, 144 (N.D.Tex.1980); *Blackie v. Barrack,* 524 F.2d 891, 908 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

Judge Meskill explained the concept of loss causation in a frequently cited dissenting opinion as follows: "the loss complained of must proceed directly and proximately from the violation claimed and not be attributable to some supervening cause." *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 719 (2d Cir.1980) (Meskill, J., dissenting), *cert. denied sub nom. Wood Walker & Co. v. Marbury Management, Inc.*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 649 (1980). The *Marbury Management* decision arose in the context of a plaintiff who sought to recover money lost through a decline in value of the securities from a broker who misrepresented his status and abilities and thereby induced plaintiff to make various speculative investments. Judge Meskill dissented from the court's judgment for the plaintiff because the losses were not directly attributable to the misrepresentations, *i.e.* no loss causation. *See also, In re Catanella And E.F. Hutton and Company, Inc. Securities Litigation*, 583 F.Supp. 1388 (E.D.Penn. 1984) (non-disclosure of broker's involvement in litigation held not to be the cause of losses associated with unsuitable investments).[4]

▪▪▪ The essential concept of loss causation is that the damages must be the direct result of the misrepresentations or omissions. The difficulty in applying this concept stems from circumstances under which the Second Circuit coined the phrase "loss causation." In securities cases, the term "loss" has its own meaning and is not necessarily related to legal damages. The cause of losses in a particular situation is not always identical to the cause of damages. *See, Green v. Occidental Petroleum Corporation*, 541 F.2d 1335, 1341–42 & n. 2 (9th Cir.1976) (Sneed, J., concurring). Generally, in cases involving misrepresentations and omissions which affect the value of an investment, the investor has a loss which is the result of the change in price of a security. This loss, however, might include both injury from the defendant's fraud and price fluctuations for other reasons. Loss and damage in this situation are not necessarily the same. From a loss perspective, a supervening event unrelated to defendant's fraud could be responsible for the ultimate loss in value. However, considering the situation from a damage viewpoint, the fraud resulting in an initial inflated price for the security is at least partially responsible for the investor's economic injury.

In *Marbury Management*, Judge Meskill did not need to differentiate between losses and damages since the misrepresentations had nothing to do with the value of the investment. Unfortunately, in *Huddleson v. Herman & MacLean*, 640 F.2d 534 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), another frequently cited case involving the concept of loss causation, the court failed to make any distinction between loss and damage. Relying on Judge Meskill's formulation of the concept, the Fifth Circuit sought to illustrate loss causation with the following example:

For example, an investor might purchase stock in a shipping venture involving a single vessel in reliance on a misrepresentation that the vessel had a certain capacity when in fact it had less capacity than was represented in the prospectus. However, the prospectus does disclose truthfully that the vessel will not be insured. One week after the investment the vessel sinks as a result of a casualty and the stock becomes worthless. In such circumstances, a fact-finder might conclude that the misrepresentation was material and relied upon by the investor but that it did not cause the *loss*.

---

**4.** It should be noted that these cases are in conflict with the decision in *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767 (9th Cir.1984), in which loss causation was not even considered an element of the action in the churning-type action. The Ninth Circuit resolved Judge Meskill's dilemma of thinking that liability, although appropriate, could not be imposed without evidence of loss causation by rejecting the requirement of loss causation in the churning situation. *Id.* at 773.

*Huddleson v. Herman & MacLean,* 640 F.2d at 549 n. 25 (emphasis added).

The misrepresentation may not be the cause of the loss; it is however, the cause of damage. By misrepresenting the capacity of the ship, the investor was induced to pay a certain price for stock in the venture. As a result of the misrepresentation, the investor paid more for the stock than it was worth.[5] When the ship sank, the entire investment was lost. The investor, however, was injured by more than the true value of the investment because he paid an inflated price for the stock. His damages thus consist of two components: the value lost due to the casualty and the amount lost because he overpaid for the stock. This latter component of damages is related directly to the initial misrepresentation. Hence, this amount should be recoverable in an action for securities fraud.

■ This reasoning is in keeping with the intent of the law. The policy behind the securities laws is to encourage full and fair disclosure of all material information in connection with the sale of securities. An interpretation of loss causation which permits violators to escape liability merely because of the occurrence of a supervening event offends the spirit of the securities laws. As Judge Meskill explained, the rationale behind the application of loss causation is to avoid making the party that is guilty of a misrepresentation or omission an insurer of the outcome of the transaction. *Marbury Management, Inc. v. Kohn,* 629 F.2d at 718–19 (Meskill, J., dissenting). The concept of loss causation, therefore, should result in a limitation of liability to that damage which is directly attributable to defendant's misrepresentations. Properly applied, the concept of loss causation will permit the plaintiff to recover only that damage caused by the misrepresentation: the amount paid over the true value. *Cf., Green v. Occidental Petrole-*

*um Corporation,* 541 F.2d 1335, 1344 (9th Cir.1976) (Sneed, J., concurring) (the difference between the purchase price and the value of a security on the date of purchase is the damages proximately caused by defendant's misrepresentations). The remainder of the losses are not recoverable as they are not the direct and proximate result of the misrepresentations. The tortfeasor has not become an insurer to the extent of all losses, he is only liable for the portion that he himself caused.

■ In the present litigation, plaintiffs' damages similarly may be composed of various components. One of the components may be the amount plaintiffs overpaid for the securities due to an inflated market price of the bonds because of the alleged misrepresentations by the Participants regarding their ability and willingness to pay. Therefore, plaintiffs should be allowed to pursue an action based on overpayment which is the direct and proximate result of misrepresentations. The requirement of loss causation is satisfied with respect to the recovery of these damages.

■ Defendants attempt to characterize this situation as one in which the injury does not occur until the obligation becomes due. They argue that the issues of ability and willingness to pay have been mooted by the Chemical Bank court decisions. The effect of those decisions, defendants urge, was to invalidate the Participants' Agreements, cutting off the obligations of the dry hole risk. This would mean that there was no need to reach the question of whether the utilities were indeed able or willing to pay as they were never obligated to do so.

This argument by defendants does not recognize, however, that in a situation of price inflation, the injury occurs at the time of purchase. Whether or not the Participants were ever called on to make payment, they made representations in the Of-

---

**5.** It is assumed that the investor would only pay the true value for the stock and that the ship's lesser capacity made the ship less valuable than represented.

ficial Statements that preceded the sale of the bonds implying that they were in a position to guarantee the bonds. It is for the trier of fact to determine whether these were misrepresentations that inflated the price of the bonds and thereby caused injury to plaintiffs. The fact that these obligations never matured is irrelevant to the injury caused by the price inflation.

### Scheme to Defraud

Plaintiffs argue that since they have pleaded a scheme to defraud, it is not appropriate to separate out the claims regarding misrepresentations of the Participants' ability and willingness to pay. In support of this position, plaintiffs cite *Kafton v. Baptist Park Nursing Center, Inc.*, 617 F.Supp. 349, 350–51 (D.Ariz.1985), in which the court concluded that loss causation need not be established with respect to each misrepresentation or omission individually. That holding reflects the common sense proposition that where there is a series of contributing misrepresentations and omissions, it may be impractical, and unnecessary, to identify precisely which of the misrepresentations directly affected the loss in question. That reasoning, however, does not do away with the requirement that the securities violators must have caused the injury—loss causation is still a necessary element. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985); *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 & n. 23 (2d Cir.1984), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *Schlick v. Penn-Dixie Cement Corporation*, 507 F.2d at 380–81.

### Rescission

Plaintiffs contend that they are entitled to rescission on the basis that the bonds would not have been marketable if the truth had been known regarding the Participants' ability and willingness to pay. "While out of pocket loss is the ordinary standard in a 10b–5 suit, ... it is within the discretion of the district judge in appropriate circumstances to apply a rescissory measure, ... or to allow consequential damages." *Blackie v. Barrack*, 524 F.2d at 908 (citations omitted); *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 n. 4 (9th Cir.1984). Although it is not clear what constitutes "appropriate circumstances", there is authority that indicates that privity is a prerequisite to the availability of rescission. *See, In re Longhorn Securities Litigation*, 573 F.Supp. 255, 273 (W.D. Okla.1983) (holding that "although strict privity is no longer crucial in an action for damages under Section 12 of the Securities Act or under Section 10(b) of the Exchange Act, it is still required in an action for rescission."). By this rule, rescission is not an appropriate remedy in this case.

Moreover, the bulk of court decisions on this issue counsel against rescission because it would over-compensate the plaintiff for his injuries. "[S]ection 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a), limits a plaintiff's recovery in a rule 10b–5 case to no more than the 'actual loss' caused by the defendant's conduct." *Beissinger v. Rockwood Computer Corporation*, 529 F.Supp. 770, 787–88 (E.D.Penn.1981). Thus, a remedy that would compensate a plaintiff by more than his actual damages is inappropriate. There are risks involved with any securities transaction. The fact that plaintiffs may have assumed more risk than they believed they were assuming provides a valid basis for a claim for damages. There is, however, no reason to void the transaction on this basis.

In a detailed analysis of the problems of measuring actual damages in a securities situation, Judge Sneed concluded that rescission is not proper because it allocates market losses to the defendant. *Green v. Occidental Petroleum Corporation*, 541 F.2d 1335, 1341–42 (9th Cir.1976) (Sneed, J., concurring). In order to avoid this problem, other courts have determined that damages should consist of the difference

between what the plaintiff paid for the security and what he would have paid in the absence of defendant's fraud. *Beissinger v. Rockwood Computer Corporation*, 529 F.Supp. at 787–88. That measure of damages is equivalent to the limits of liability imposed by the requirement of loss causation. In *Harris v. Union Electric Company*, 787 F.2d 355, 367 (8th Cir.1986), the court noted that there was an overlap between loss causation and damage calculations. This overlap is evident in that both concepts lead to the same characterization of a defendant's liability. From both the causation and the damage point of view, a wrongdoer is only held responsible for the harm that is the direct result of his wrongdoing.

## CONCLUSION

Plaintiffs' claims based upon misrepresentation regarding the Participants' ability and willingness to fulfill their "dry hole" obligations under the Participants' Agreements are legally cognizable. The alleged misrepresentations are actionable based upon plaintiffs' allegations that they resulted in payment of an inflated price for the WPPSS bonds. That injury, if it is found to be the direct and proximate result of misrepresentations, is compensable as a matter of law regardless of any other factor causing a decline in the value of the WPPSS bonds.

Defendants' motions with respect to ability and willingness to pay claims are DENIED.