Robert LUCIA, et al., Plaintiffs,

v.

**PROSPECT STREET HIGH INCOME PORTFOLIO, INC., et al., Defendants.**

**Civ. A. No. 90–10781–MA.**

United States District Court, D. Massachusetts.

July 2, 1991.

Nancy Gertner, Silverglate, Gertner, Fine & Good, Boston, Mass., Robert M. Roseman, Rudolph, Seidner, Goldstein, Rochestie & Salmon, P.C., Eugene A. Spector, Eugene A. Spector & Associates, Philadelphia, Pa., for plaintiffs.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

The above-captioned case encompasses four separate actions [1] consolidated by stip-

---

**1.** *Lucia v. Prospect Street High Income Portfolio, Inc.,* Civil Action No. 90–10781, filed Mar. 27, 1990; *Bomireto v. Prospect Street High Income Portfolio, Inc.,* Civil Action No. 90–10846, filed Apr. 2, 1990; *Runda v. Prospect Street High Income Portfolio, Inc.,* Civil Action No. 90–12009, filed Aug. 17, 1990; *Montalbano v. Pros-*

ulation pursuant to Fed.R.Civ.P. 42(a). The parties agree that the Amended Class Action Complaint filed in the *Lucia* and *Bomireto* cases is the operative complaint and that the parties are free to raise statute of limitations defenses based on the dates that individual complaints were filed.

The complaint alleges various violations of federal securities law, fraud, misrepresentation, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), against defendant Prospect Street High Income Portfolio, Inc. ("Prospect Street" or "the Portfolio"), its directors, and underwriters. All four cases were originally drawn to Judge Wolf, and the defendants had filed motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) when this court issued its opinion in *Miller v. New America High Income Fund,* 755 F.Supp. 1099 (D.Mass.1991). Noting the similarities between the *New America* case and the cases before him, Judge Wolf transferred the instant litigation to this court. This memorandum and order decides the pending motions to dismiss.

## I. BACKGROUND

To say that the instant case and *New America* are similar is an understatement. The *Lucia* complaint repeats the lengthy allegations of the *New America* complaint nearly verbatim, changing only a few particulars to tailor the complaint to fit the facts of the Prospect Street initial public offering ("IPO"). (In all fairness, it should be noted that the prospectus issued in connection with the Prospect Street IPO borrowed nearly as liberally from the New America prospectus as the present complaint borrows from that filed in *New America.*)

Defendant Prospect Street is a Maryland corporation with a principal place of business in Boston, organized to invest primarily in "high-yield" fixed securities rated in the lower categories by established rating agencies (*i.e.,* "junk bonds"). Defendant Prospect Street Investment Management Company, Inc. (the "Investment Adviser"), is responsible for the management of Pros-

pect Street's portfolio. The individual defendants Omohundro, Frabotta, Carey, Cote, Meyohas, and Platt are all directors of Prospect Street; Omohundro serves as president of both Prospect Street and the Investment Adviser, and Frabotta is Prospect Street's Vice President, Secretary, and Treasurer. Defendant Thomson McKinnon Securities was, along with the now defunct Drexel Burnham Lambert, Inc., the lead underwriter for Prospect Street's IPO. Thomson McKinnon was also named as representative of the putative defendant class of all underwriters of the IPO. Defendant Milken, throughout the relevant time period, was the head of Drexel's high-yield bond department. The *Runda* complaint named defendant Prudential–Bache Securities Inc. ("Prudential") as the lead underwriter and as the representative of the defendant class.

Plaintiffs represent a putative class of purchasers of Prospect Street common stock during the period from November 28, 1988, to October 13, 1989, inclusive, and a putative subclass of purchasers of common stock issued in the IPO. In the IPO, pursuant to a prospectus and registration statement dated November 28, 1988, Prospect Street issued 12 million shares of common stock at $10 per share. By the end of April, 1989, more than 13 million shares of common stock were outstanding. The plot thickened when on April 14, 1989, a study headed by Massachusetts Institute of Technology professor Paul Asquith reported that the rate of default of junk bonds was much higher than issuers had been claiming. This study, according to the complaint, signalled the beginning of the demise of the junk bond market in general, and of Drexel Burnham and Milken in particular. Nonetheless, on June 12, 1989, Prospect Street issued its semi-annual report for the period ending April 30, 1989, which continued to maintain a rosy outlook.

During the summer of 1989, bad news about the junk bond market continued to leak out and "the quoted prices at which junk bonds were reportedly selling became

*pect Street High Income Portfolio, Inc.,* Civil Action No. 90–12913, filed Dec. 4, 1990.

severely depressed. However, defendants continued to maintain that Prospect Street because of its investment strategy, still remained a solid investment." Amended Class Action Complaint ¶ 70 [hereinafter Complaint]. October 31, 1989, saw an historic drop in the stock market and a corresponding collapse in the junk bond market. On November 10, 1989, Prospect Street "slashed" the monthly dividend to 9 cents per share. (On August 9, the directors had declared a 12 cent dividend; in September, the dividend decreased to 11.25 cents.)

Plaintiffs allege that all the named defendants were engaged in a conspiracy "to enable Prospect Street to complete the IPO and to inflate and maintain the price of Prospect Street stock at artificial levels by issuing materially false and misleading information." Complaint ¶ 14(a). The complaint divided the misrepresentations into five categories: statements that minimized the default rate of junk bonds, particularly those used to finance mergers and acquisitions, id. ¶ 76(a); failure to disclose Milken's "inner circle" of purchasers of junk bonds, id. ¶ 76(b); representations that the bonds that Prospect Street intended to purchase would be selected "on the basis of a professional effort to maximize investment potential," when the defendants knew that Prospect Street was an instrument of conspiracy and the "purchaser of last resort" of Drexel's junk bonds, id. ¶ 76(c); misrepresentations of the significant risks of the bonds in Prospect Street's portfolio and of junk bonds in general, id. ¶ 76(d); and failure to disclose that the "bid prices" for junk bonds were artificially inflated. Id. ¶ 76(e). While the plaintiffs paint with a broad brush to describe the nature of the false and misleading statements attributable to defendants, they point only to two specific sources of these statements: the prospectus and the semi-annual report.

In *New America,* this court dismissed plaintiffs' claims under section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b); under SEC Rule 10b–5, 17 C.F.R. § 240.10b–5; as well as the state-law fraud and negligent misrepresentation claims on the basis of plaintiffs' failure to plead "loss causation." *New America,* 755 F.Supp. at 1106–09. Finding that this failure was not fatal to a cause of action under either section 11 and 12(2) of the Securities Act of 1933, as amended, 15 U.S.C. §§ 77k, 77*l* (2), I denied the motion to dismiss those claims. As in *New America,* 755 F.Supp. at 1104, plaintiffs here have alleged three specific misleading statements that could form the basis for section 11 and section 12(2) actions. Taking as true for the moment plaintiffs' allegation that Prospect Street was created as a purchaser of last resort for the least desirable of Drexel's junk bond issues and imputing this knowledge to the defendants,[2] the use of the DBL Composite, *see* Complaint ¶ 51, Prospect Street's claim that it would engage in temporary defensive investment strategies, *id.* ¶ 48, and the prospectus's indication the Prospect Street would invest in "growth-stage" bonds, *id.* ¶ 50, may have been misleading. As in *New America,* however, statements in the Prospect Street prospectus with regard to the junk bond market cannot be a basis for any securities law violations, as the prospectus contained multiple warnings about the junk bond market. Likewise, statements in the prospectus that the Portfolio would be managed in accordance with Standard & Poor guidelines were not misleading as to the common stock purchasers because the prospectus made it clear that these guidelines related only to the notes and preferred stock. Finally, any liability based on mismanagement of the Portfolio is not the subject of a federal securities law violation. *See* 755 F.Supp. at 1103–04 & n. 7.

Defendants in their motions to dismiss before Judge Wolf did not base their argument on "loss causation," although in its reply brief filed with this court, Prudential pointed out that the reasoning in *New America* is dispositive of the instant securities fraud allegations. Plaintiffs addressed the issue of loss causation in their papers, and I discuss it below.

---

**2.** This assumption is relaxed below. *See infra* Part III.B.

As the principal ground for their motion to dismiss, defendants argue that the plaintiffs failed to plead fraud with adequate particularity. Fed.R.Civ.P. 9(b). Plaintiffs have briefed this argument, asserting that the complaint satisfies Rule 9(b), and even if it does not, that the rule does not apply to complaints alleging violations of sections 11 and 12(2).

Finally, defendant Prudential argues that, as to it, the sections 11 and 12(2) claims in the *Runda* complaint are barred by the statute of limitations. I discuss each of these arguments in turn.

## II. LOSS CAUSATION

■ Defendants are correct to assert that the resolution of the section 10(b), fraud, and negligent misrepresentation claims in *New America* is dispositive of the same claims in the instant litigation. In *New America*, this court held that the plaintiffs failed to plead a key element of a securities fraud claim—loss causation—in that they did not allege how the misrepresentations of which they complained caused their injury. There, as here, the plaintiffs' viable misrepresentation claims were based on statements that may have led purchasers of common stock to believe that the defendant Fund would buy high-yield bonds issued by growth-stage companies of the kind represented in the DBL Composite rather than bonds issued in connection with mergers and acquisitions, and that the defendants would use temporary defensive investment strategies. The complaint, however, utterly failed to tie these misrepresentations to the plaintiffs' loss; instead, they linked their loss to the disastrous fall of the junk bond market, a risk of which they were sufficiently aware. In other words, even if what the plaintiffs were led to believe about New America were true, the same loss would have occurred.

In the instant case, the pleadings suffer from the exact same deficiency. The complaint alleges exactly the same misrepresentations and tells the same story with regard to the decline of the junk bond market. The complaint fails to tie the violations complained of to the injury suffered.

In their opposition to the motion to dismiss, the plaintiffs argue that they have adequately pled loss causation. They cite Judge William D. Browning's persuasive analysis in *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 650 F.Supp. 1346, 1352–55 (W.D.Wash.1986), in which the court drew a distinction between the losses caused by section 10(b) violations and the losses effected by supervening causes. Judge Browning criticized the example used in *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 n. 25 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), of the loss suffered by investors in a sinking ship who knew full well that the vessel would be uninsured but were misled as to the ship's capacity. While the Fifth Circuit reasoned that the misrepresentations did not cause the loss, Judge Browning countered that absent this misrepresentation, an investor would still have suffered a loss, but the loss would have been smaller if the misrepresentation had not occurred. "His damages thus consist of two components: the value lost due to the casualty and the amount lost because he overpaid for the stock. This latter component of damage is related directly to the initial misrepresentation. Hence, this amount should be recoverable in an action for securities fraud." *Washington Pub. Power*, 650 F.Supp. at 1354. The damage caused by the misrepresentation is "the difference between what the plaintiff paid for the security and what he would have paid in the absence of defendant's fraud." *Id.* at 1355–56. *Accord Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 980 (E.D.N.Y.1988). Noting that the policy of securities law is to encourage full and fair disclosure, Judge Browning said, "An interpretation of loss causation which permits violators to escape liability merely because of the occurrence of a supervening event offends the spirit of the securities laws." *Id.*

The logic of Judge Browning's decision is compelling, but wholly inapplicable to the plaintiffs in this case. It is true that in the

section 10(b) count, the plaintiffs state, "If the defendants had revealed the true facts, plaintiffs and the other members of the Plaintiff Class would not have paid the artificially and falsely inflated prices that they did in fact pay for the common stock...." Complaint ¶ 97. Applying the holding of *Washington Public Power*, "plaintiffs' injury would be the difference between the price paid and the true value of the stock when it was purchased." Plaintiffs' Memorandum in Opposition to Motions to Dismiss at 32 [hereinafter Plaintiffs' Brief]. The injury would not include the lost value that was due to the decline of the junk bond market or to plaintiffs' misapprehension of the value of junk bonds in general. The difficulty of proof and the speculative nature of this damage measure aside, this approach is wholly inconsistent with the plaintiffs' theory of the case.

In *Washington Public Power*, the plaintiffs' claims of injury were clearly based upon payment of an inflated price that was attributed to a specific misrepresentation. In the instant case, the plaintiffs' claim that they paid an artificially inflated price is based on their dismay that they were induced to invest in Prospect Street at all. It is clear from the complaint that the injury of which plaintiffs complain is not that they were misled about the specific types of bonds and management practices that Prospect Street intended to pursue, but rather that they were misled about the junk bond market:

> The IPO Prospectus and public filings of the Fund were materially misleading and omitted to disclose that the actual risk of default associated with junk bonds was significant and was materially greater than DBL had led the investment community to believe and that the potential rewards associated with the bonds were materially lower than DBL had led investors to believe.

Complaint ¶ 76(a). As in *New America, see* 755 F.Supp. at 1108, the complaint maintains throughout that the cause of plaintiffs' loss was the decline in the high-yield bond market. *See* Complaint ¶ 62 ("junk bond market began to tumble"); *id.* ¶ 65

(disclosures of "increase in junk bond defaults"); *id.* ¶ 70 ("the quoted prices at which junk bonds were reportedly selling became severely depressed"); *id.* ¶ 71 (study indicates that "junk bonds were not as lucrative as investors and traders had been led to believe"); *id.* ¶ 73 ("collapse in the price of junk bonds"). Finally, in their brief, plaintiffs argue that "Prospect Street's stock would have been unmarketable had defendants disclosed all facts regarding the nature of, and risk of purchasing, Prospect Street common stock." Plaintiffs' Brief at 36. *See also id.* at 37 ("defendants conspired to sell securities that were not entitled to be marketed").

Such statements are a far cry from the modest measure of damages that plaintiffs now must characterize their complaint as alleging to bring it in line with *Washington Public Power*. The plaintiffs clearly seek to recover value lost because of the casualty, not merely the amount they overpaid for the stock. There can be no doubt, however, given the disclosures that abound in the prospectus, but that the plaintiffs wanted to invest in junk bonds and knowingly risked the casualty. To paraphrase *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 686 (7th Cir.1990), "The plaintiffs in the present case were not told that [junk bond funds] are risk-free. They knew they were assuming a risk that [junk bond values] might drop unexpectedly." The occurrence of that risk is the injury for which plaintiffs here seek redress.

In their brief, plaintiffs requested leave to amend their complaint in the event that the court chose to allow the motion to dismiss on the ground of loss causation, in order to substitute "more specifically worded allegations." Plaintiffs' Brief at 34. Although I intend to grant the requested leave to amend, the court will not be satisfied with "more specific" wording. In order to clear the loss causation hurdle, the plaintiffs must completely alter their theory of this case to make it clear they seek to recover only the damages they can prove were specifically caused by legally actionable misrepresentations: "To the extent that these alleged misrepresentations can be shown to have resulted in payment of an

inflated price for the bonds, such misrepresentations may be found to be the direct and proximate cause of the injury to plaintiffs and therefore compensable under the securities laws." *Washington Pub. Power*, 650 F.Supp. at 1350. Plaintiffs will not be heard to request indemnity for the losses caused by the demise of the junk bond market, in which they fully intended to invest with all its associated risks.

## III. PARTICULARITY REQUIREMENT

Properly pleading loss causation is not the only hurdle that plaintiffs will have to clear in amending their complaint, because I also find that the complaint before me fails to satisfy Fed.R.Civ.P. 9(b) in that it does not plead the complained of fraud with adequate particularity.

### A. Applicability to Sections 11 and 12(2)

■ While the plaintiffs do not dispute that failure to comply with Rule 9(b) is fatal to a securities fraud claim based on section 10(b), it is unsettled whether the rule's particularity requirements also apply to alleged violations of sections 11 and 12(2). On the facts of the instant case, I hold that Rule 9(b) does apply.

In order to be found liable for a violation of sections 11 or 12(2), defendants need not act with fraudulent intent. Nonetheless, the courts are divided on whether Rule 9(b) should apply. The cases cited by the parties are not of much help. Defendants cite *In re Elscint, Ltd. Sec. Litig.*, 674 F.Supp. 374, 384 (D.Mass.1987), in which Judge Keeton summarily states that "actions under Section 10(b) and Rule 10b–5 are similar to actions under Section 11, both in terms of subject matter and the applicability of the pleading requirements of Rule 9(b)." Plaintiffs cite *Loan v. FDIC*, 717 F.Supp. 964, 968 n. 9 (D.Mass.1989) (Tauro, J.), to the contrary: "Rule 9(b)'s particularity requirement does not apply to § 12(2) because no fraud must be alleged or proven." This court's independent research has discovered one court of appeals opinion holding that Rule 9(b) applies. *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 499 (5th Cir.1990) (affirming district court's de-

cision, appended at 918 F.2d 500, 505, that section 12(2) claim fails "because plaintiff provides no particularized facts to support his Section 12(2) allegations"). Another circuit, though not reaching the question, has implied that Rule 9(b) is inapplicable, because "Rule 9(b) requires fraud and mistake to be pled with particularity" but "[n]either fraud nor mistake is a necessary element of a § 12(2) claim." *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 645 n. 28 (3d Cir.1990).

The most thoughtful discussion of this question that this court has found is contained in an opinion of a district court within the First Circuit. In *Haft v. Eastland Fin. Corp.*, 755 F.Supp. 1123, 1132 (D.R.I.1991), Judge Pettine carefully analyzed the reasons for the particularity requirements with respect to section 10(b) claims and held that the same policy concerns may or may not apply to section 11 violations, depending upon the type of behavior alleged. He concluded that section 11 claims should not be subjected to the requirements of Rule 9(b) "only ... when the Section 11 claim is not based on allegations of fraud." *Id.* (citing *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 595 (E.D.Mich.1985)). Judge Pettine's analysis comports with the First Circuit's general holding that "where fraud lies at the core of the action, Rule 9(b) applies." *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.1985).

In the instant litigation, it is clear that fraud, not negligence, lies at the core of the complaint. The complaint alleges,

A conspiracy, common enterprise and common course of conduct commenced at least as early as November 28, 1988 and involved all the defendants. The purpose and effect of the conspiracy, common enterprise and common course of conduct complained of was, *inter alia* to enable Prospect Street to complete the IPO and to inflate and maintain the price of Prospect Street stock at artificial levels by issuing materially false and misleading information in violation of the antifraud provisions of the federal Securities laws,

the Racketeer Influenced Corrupt Organization Act, and related state laws. Complaint ¶ 14(a). Although plaintiffs, following the language of the statute, recite a claim sounding in negligence with respect to the Section 11 violation, *id.* ¶¶ 80, 81, their allegations of the section 12(2) violation state that the defendants "employed schemes and artifices to defraud." *Id.* ¶ 89. It is clear that the behavior of which plaintiffs complain is not mere negligence or failure to comply with section 11's "due diligence" requirement; the plaintiffs' claim is based on an intentional effort to defraud. Moreover, in order to render the statements in the prospectus misleading, it is necessary to begin with the background assumption that "[d]efendants used Prospect Street as a purchaser of last resort," *id.* ¶ 76(c), clearly an allegation of fraud. Thus, on the facts of the case before me, I hold that the particularity requirement of Rule 9(b) applies to the claims alleged under sections 11 and 12(2) as well as under section 10(b) and the common law of fraud.

### B. *Sufficiency of the Complaint*

■ Although there are many First Circuit cases that deal with the particularity requirement in securities fraud cases, the most recent delineation of the standard is found in *Romani v. Shearson Lehman Hutton,* 929 F.2d 875 (1st Cir.1991). The facts of *Romani* are somewhat analogous to those in the case at bar. The defendants were selling agents, general partners, and accountants connected with the public offering of limited partnership interests in a horsebreeding business. The plaintiffs alleged numerous misrepresentations about the particular partnership, its management, and the prospects of the horsebreeding business.[3] The district court dismissed the complaint for violation of Rule 9(b), and the court of appeals affirmed.

The First Circuit, in its discussion of the pleadings, was willing to assume that the

plaintiffs had adequately alleged the time, place, and content of the alleged misrepresentations. *See Wayne Investment v. Gulf Oil Corp.,* 739 F.2d 11, 13 (1st Cir. 1984). This court is also willing to make that assumption with respect to the misrepresentations alleged in the case at bar. The deficiency in the *Romani* case, as here, was that

> the allegations of fraud are entirely unsupported. The complaint contains no factual allegations that would support a reasonable inference that adverse circumstances existed at the time of the offering, and were known and deliberately or recklessly disregarded by defendants. Where allegations of fraud are explicitly or, as in this case, implicitly, based only on information and belief, the complaint must set forth the source of the information and the reason for the belief.

*Romani,* 929 F.2d at 878. The First Circuit held that the complaint in *Romani* failed to satisfy this standard because, with the exception of one allegation, which was based on facts that the defendants could not have known at the time of the offering, "[n]one of the plaintiff's other asserted material omissions is supported by any allegations of fact." *Id.* at 879.

The claim before this court is similarly deficient. The heroic assumption of this case—which must be supported by facts in order to satisfy the requirements of Rule 9(b)—is that the directors and underwriters created Prospect Street as a captive market for Drexel's unmarketable junk bonds and then misled the public in order to raise capital for this endeavor. The IPO took place on November 28, 1988, but plaintiffs have failed to plead any facts or any reason for a reasonable belief that "adverse circumstances existed at the time of the offering, and were known and deliberately or recklessly disregarded." *Id.* at 878. Most fundamentally, the complaint, in 53 pages,

---

**3.** Particularly relevant to the claims regarding Prospect Street and the junk bond market was the allegation in *Romani* that "the standardbred horse industry, in general, and [the defendant partnership] in particular, was entering a recessionary period and, thus, representations made

to investors which were largely based on past performance which occurred amidst dramatically more favorable operation conditions and markets, were materially false, misleading, and deceptive." 929 F.2d at 877.

does not recite a single *fact* that suggests that any of the defendants, with the exception of Milken, had any basis for knowing that their statements in the prospectus were misleading.

With respect to Milken and Drexel Burnham, plaintiffs allege that "after DBL and Milken had come under scrutiny by federal authorities for criminal violations of the federal securities laws, DBL commenced efforts to enhance its public image with a campaign directed to the further promotion of junk bonds as a positive financing technique." Complaint ¶ 39. Furthermore, the complaint states, "[A]cknowledging that junk bonds had some 'image' problem, Milken announced plans to create new mechanisms to allow junk bonds to be replaced by securities with investment grade ratings." *Id.* ¶ 42. These paragraphs arguably allege sufficient facts for an inference that Milken was aware, before the IPO, that the junk bond market was vulnerable. The shortcoming of this bit of factual support for plaintiffs' allegations of fraud is that the prospectus sufficiently disclosed these problems. The prospectus devoted a full paragraph of its summary section to disclosing that the SEC had initiated a civil action against Drexel for securities law violations and that some of Drexel's employees were under grand jury investigation. This paragraph concluded,

> Drexel Burnham has advised the Fund that no assurance can be given that the results of the SEC action or grand jury investigation will not have an adverse effect on Drexel Burnham and/or the market for 'high yield' securities, a market in which Drexel Burnham is an important participant.

Prospectus at 9. *See also id.* at 33 (same). Moreover, the prospectus declares throughout that high-yield bonds are riskier than other investments, that the market is less liquid, and that an investment in Prospect Street is "not appropriate for all investors." *See, e.g., id.* at 1, 3, 8, 10, 14, 26.

The first factual indication of troubles in the junk bond market included in the complaint is the mention of the Asquith study, which was published on April 14, 1989, months after the IPO. The complaint also cites articles in *Barron's* and the *Wall Street Journal* published in July, August, and October of 1989, all disclosing alarming rates of default and poor performance of junk bonds and junk bond funds, including Prospect Street. There is, however, no fact alleged that provides any reason to believe that the defendants had prior knowledge of the contents or underlying data of these articles that could be attributed to them at the time of the offering.

Plaintiffs cite only one fact that would support an inference that Milken and the other defendants intended to use Prospect Street as a purchaser of last resort of unmarketable issues of junk bonds:

> *Barron's* August 28, 1989 edition and a subsequent article in *Barron's* dated October 9, 1989 revealed that the junk bond market had to a significant extent consisted not of arms'-length purchasers of junk bonds, but of captive purchasers for whom DBL had previously underwritten junk bonds and who in turn purchased large quantities of junk bonds from Drexel in what Benjamin Stein, writing in *Barron's* described as Michael Milken's "Daisy Chain."

Complaint ¶ 69. This single allegation is hardly a sufficient basis on which plaintiffs could reasonably draw the conclusion that Prospect Street's directors and underwriters created the Portfolio as part of a scheme to defraud investors.

Apart from the prospectus, the complaint contains only one other allegation of a misrepresentation attributable to defendants, the President's letter in the semiannual report, issued June 12, 1989. *See* Complaint ¶ 63. The portion of the letter included in the complaint is reproduced in full in the margin.[4] The complaint is de-

---

4. Since commencement of operations on December 5, 1988, the Fund has performed according to our original expectations. We anticipate, based upon the current portfolio and borrowing costs, that the Fund will generate net investment income available to shareholders of common stock of approximately $17.5

void of any facts to indicate that the announcement of past performance was untrue or that, at the time of the semi-annual report, the defendants had a basis for knowing that the statement of anticipated performance was misleading.

In sum, the complaint does not provide any factual support for the allegations of fraud, nor does it give a sufficient factual basis on which plaintiffs could reasonably conclude that the defendants knew or should have known of adverse circumstances that would render their statements in the prospectus and semi-annual report misleading. As such, the complaint fails to comply with Rule 9(b).

The plaintiffs have requested leave to amend with regard to loss causation, and as the *Romani* decision was published after the complaint was filed, I will also allow leave to amend the complaint to rectify the Rule 9(b) deficiencies, if possible. *See* Fed. R.Civ.P. 15(a) (leave to amend complaint "shall be freely given when justice so requires").

## IV. OTHER CLAIMS

### A. *Statute of Limitations*

■ Defendant Prudential asserts that the section 11 and 12(2) claims in the *Runda* complaint, the first complaint of these consolidated cases to name Prudential as a defendant, are barred by the statute of limitations.

Claims brought under sections 11 and 12(2) of the Securities Act must be brought within one year after the untrue statement or omission was or should have been discovered and, in any event, no more than three years after the offering. 15 U.S.C. § 77m. *See Cook v. Avien, Inc.,* 573 F.2d 685, 697–98 (1st Cir.1978) ("sufficient storm warnings to alert a reasonable person to

the possibility that there were either misleading statements or significant omissions" initiate running of statute of limitations). Prudential argues that if the "storm warnings" in the present case are assumed to date from the publication of the Asquith study in April, 1989, then the *Runda* complaint, filed in August, 1990, was too late.

Plaintiffs argue that the facts surrounding the events in this case are as yet unclear and that more factual development is necessary to determine exactly when the statute of limitations period began. I agree. As this 12(b)(6) motion must be decided on the pleadings alone, I have not read the Asquith study and cannot determine whether it was sufficient to put the plaintiffs on inquiry notice to misrepresentations and omissions in the prospectus. Dismissal for failure to comply with the statute of limitations is therefore, at present, unwarranted.

### B. *Remaining Counts*

As to Count VII, alleging RICO violations against the investment adviser, the directors, and the underwriters, I will allow the motions to dismiss these claims because plaintiffs have failed to allege two predicate acts. *See* 18 U.S.C. § 1961(5) (definition of "pattern of racketeering activity"). To the extent that plaintiffs rely on securities violations to comprise the predicate acts, the ultimate survival of this RICO count depends on plaintiffs' ability to bring their complaint into compliance with Rule 9(b) and to plead loss causation with respect to the section 10(b) claim.

As to Count VI, alleging RICO violations against Milken, I will allow the motion to dismiss for the same reasons stated in *New America,* 755 F.Supp. at 1110, namely, fail-

---

million or $1.44 per common share on an annualized basis.

    \*    \*    \*    \*    \*    \*

Net investment income generated during the start-up period, December 5, 1988 through April 30, 1989, was approximately $8.1 million or $.61 per common share. As of April 30, 1989, the dividend rate on the Fund's preferred stock was 10.00% and the interest rate on the fixed rate debt was 10.28%.

Complaint ¶ 63. At ¶ 70, the complaint states that junk bond prices "became severely depressed" sometime in the latter half of 1989, and that "defendants continued to maintain that Prospect Street because of its investment strategy, still remained a solid investment." The complaint does not specify when or where the defendants made any such representation.

ure to allege two predicate racketeering acts and failure to show that plaintiffs' injury was "by reason of," 18 U.S.C. § 1964(c), Milken's conduct of Drexel Burnham's affairs.

In accordance with the foregoing, the defendants' motion to dismiss is ALLOWED with respect to the Amended Class Action Complaint in its entirety. Plaintiffs shall file a second amended complaint to bring Counts I–V and VII into compliance with this opinion within twenty days from the date of this order, and defendants shall respond in the time set forth in Fed.R.Civ.P. 15(a).

SO ORDERED.